UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| NATHAN LEFTENANT, ARNETT LEFTENANT, JERYL BRIGHT, GREGORY JOHNSON, and THOMAS ("TOMI") JENKINS,<br><br>    Plaintiffs,<br><br>    v.<br><br>LAWRENCE ("LARRY") BLACKMON,<br><br>    Defendant. | Case No. 2:18-cv-01948-EJY<br><br>**ORDER** |
| LAWRENCE ("LARRY") BLACKMON,<br><br>    Counterclaim Plaintiff,<br><br>    v.<br><br>NATHAN   LEFTENANT,   ARNETT LEFTENANT, JERYL BRIGHT, GREGORY JOHNSON,  and  THOMAS  ("TOMI") JENKINS,<br><br>    Counterclaim Defendants. | |

Pending before the Court are the parties cross-motions for summary judgment.  Plaintiffs filed their motion three times.[1]  ECF Nos. 273, 274, 306.  In this Order, the Court cites to Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion") at ECF No. 306 and the exhibits attached to ECF No. 273; Defendant's Opposition at ECF No. 284 and the exhibits attached thereto; and Plaintiffs' Reply at ECF No. 298.  Defendant Lawrence Blackmon filed his Motion for Summary Judgment twice.[2]  ECF Nos. 275, 276-1.  Herein, the Court cites to Defendant's Motion for Summary Judgment ("Defendant's Motion") at ECF No. 276-1, exhibits attached to ECF No. 275; Plaintiffs' Opposition at ECF No. 292 and exhibits thereto that are found at 282-1; and Defendant's Reply at ECF at No. 299.

---

[1]     Collectively, any reference to "Plaintiffs" includes of Nathan Leftenant ("N. Leftenant"), Arnett Leftenant ("A. Leftenant"), Jeryl Bright ("Bright"), Gregory Johnson ("Johnson"), and Thomas "Tomi" Jenkins ("Jenkins").
[2]     Lawrence "Larry" Blackmon is referred to herein as "Defendant" or "Blackmon."

Plaintiffs move for summary judgment in their favor and against Defendant on Count I of Plaintiffs' claim (intentional interference with contractual relations) and Counts I through V of Defendant's Counterclaims.   ECF No. 306 at 2.   Plaintiffs inexplicably also detail portions of Defendant's Counterclaims on which they seek summary judgment, but these separate requests are subsumed under the motion seeking summary judgment on all of Defendant's claims.  *Id*.  Defendant moves for summary judgment in his favor and against Plaintiffs on his Counterclaims I through V, as well as Plaintiffs' Counts I and V.  ECF No. 276-1 at 51.

## I.    Summary of Facts

The facts of this case are well known to the parties and the Court.  The entirety of those facts is not repeated here.  Only those facts the Court finds most important are summarized.

Blackmon first began performing in the mid-1970s as the New York City Players, a funk band that was renamed CAMEO (also referred to herein as the "Band").   CAMEO immediately included Jenkins and Johnson.   ECF No. 284 (Blackmon's Response to Plaintiffs' Motion for Summary Judgment) at 5-6.  Blackmon does not dispute that these two Plaintiffs were founding members of CAMEO.  *Id*.  Whether Plaintiffs A. Leftenant and N. Leftenant were founding members of the Band is in dispute.  *Id*.  Blackmon does not dispute that CAMEO, which Blackmon did not trademark for live performances until March 28, 2017,[3] has released 18 albums, numerous singles, and performed live countless times since the mid-70's.  ECF No. 276-1 (Blackmon's Motion for Summary Judgment) at 6 ¶ 6.  Blackmon also does not dispute that he does not have a registered trademark for CAMEO sound recordings.  ECF No. 284 at 15 ¶ 56, response thereto.

Additional undisputed facts include:

- Jenkins gave 45 years of service to CAMEO, appeared on all 18 CAMEO albums, and appears on the 2019 single "El Passo" released with Blackmon.  ECF No. 284 at 2 ¶ 2, response thereto.

- Jenkins stopped performing with CAMEO in 2018 to join the present lawsuit.  *Id*. at 15 ¶ 40, not disputing this fact.

- "An article was written and published about … Jenkins['] musical career" and then-upcoming solo single release on www.SoulTracks.com.  The article was not written

---

[3]    Blackmon commenced the trademark application process on August 23, 2015 and was granted the mark on March 28, 2017.  ECF No. 284 at 17-18, ¶¶ 49, 54 responses thereto.

by or titled by Jenkins." Jenkins posted a link to the article on his Facebook page. *Id*. at 22 ¶ 71, response thereto.

- A. Leftenant and N. Leftenant were members of the famous Tity Brother's Horn section; N. Leftenant gave 30 years of service to CAMEO and appeared on more than 16 CAMEO albums; A. Leftenant appeared on seven CAMEO albums and was with the Band for six years. *Id*. at 6 ¶¶ 3 and 4, response not disputing these facts.

- N. Leftenant identified himself as the "front man, trumpeter and vocalist for CAMEO" on his personal Twitter home page. ECF No. 292 (Plaintiffs' Response to Defendant's Motion for Summary Judgment) at 10 ¶ 31. Undisputed.

- "Johnson left the Band in 1982 and has not performed with, recorded with, or had any role in the band for nearly three decades." *Id.* at 6 ¶ 18. Undisputed.

- Bright did not begin recording with CAMEO until late 1979 and left the Band in approximately 1982. After that, Bright appeared in live performances "on sporadic occasions. … Otherwise, since his departure, … Bright has not performed or recorded with the [B]and, nor has he had any role in the [B]and's business affairs." *Id*. at 7 ¶ 20. Undisputed.

- Plaintiffs registered with SoundExchange between 2008 and 2015. ECF No. 284 at 9-10 ¶ 21. Undisputed. Sound Exchange was formed in 1995 following an amendment to the Copyright Act of 1976 to collect and pay newly created digital audio performing rights royalties to "featured performers."

- Blackmon registered CAMEO Music Inc. with SoundExchange as a group in December 2009. ECF No. 284 at 10 ¶ 24, response thereto; ECF No. 292 at 11 ¶ 42.

- On October 10, 2012, Kathryn "Kat" Fain ("Fain") notified SoundExchange on behalf of Blackmon that Blackmon was claiming 100% of the featured artist royalties for CAMEO. *Id*. at 12 ¶ 46. Undisputed.[4]

- Blackmon and Fain assisted Jenkins when he registered in May 2013 to receive CAMEO royalties through SoundExchange. Jenkins recognized there was a dispute over the Band's royalties at the time he registered. *Id.* at 13 ¶¶ 49, 50. Undisputed.

- N. Leftenant emailed SoundExchange on July 11, 2013 telling the entity that he wanted "all royalties [for CAMEO] held until we decide who gets what." *Id*. at 13 ¶ 51. Undisputed. *See also* ECF No. 275-6 (Samuels Decl. Ex. 29) at 32.

- "Prior to 2013, CAMEO royalties collected by SoundExchange were split five ways" among Baby Buddha's House, LLC 20%, Aquitaine Corporation 20%, CAMEO Music Inc. 20%, N. Leftenant 20%, and 20% to Unknown. ECF No. 292 at 11 ¶ 43. Undisputed.[5]

- On July 12, 2013, Blackmon notified SoundExchange that he and Jenkins were to receive an 80/20 split of CAMEO royalties, to which Jenkins agreed. *Id*. at 14 ¶¶ 55 and 56. Undisputed.

---

[4]  What prompted Blackmon to take this action is disputed by the parties. Also disputed is whether 100% of the royalties were placed on hold at this time.
[5]  It is undisputed that Aquitaine Corporation was collecting royalties for Jenkins without his consent. ECF No. 292 at 13 ¶ 48.

- On July 12, 2013, N. Leftenant requested a 33% split of the CAMEO royalties among Blackmon, Jenkins, and himself. *Id* at 14 ¶ 57. Undisputed.

- On July 19, 2013, SoundExchange notified N. Leftenant and Jenkins (along with Blackmon) that all future artist royalties for CAMEO would be placed on hold until the parties agreed on the distribution. *Id*. at 14-15 ¶ 58 *citing* ECF No. 275-6 (Samuels Decl. Ex. 32) at 48. Undisputed.

- On October 1, 2014, Bright was notified by SoundExchange of the CAMEO royalties hold. ECF No. 275-6 (Samuels Decl. Ex. 33) at 51. Undisputed.

- On October 7, 2014, A. Leftenant copied Johnson on an email to Blackmon's counsel acknowledging the dispute over CAMEO royalties. On the same date, Blackmon's counsel responded with a proposed resolution and A. Leftenant emailed in return, copying Johnson and N. Leftenant, saying he would discuss the proposals with others. ECF No. 292 at 15 ¶¶ 61-63. Undisputed. *See also* ECF No. 142-1 at 2-3 (Oct. 7, 2015 email between A. Leftenant and counsel for Blackmon acknowledging dispute over split of CAMEO royalties held by SoundExchange).

- When claims to more than 100% of royalties are made to SoundExchange, SoundExchange places the distribution of royalties on hold. ECF No. 292 at 15 ¶ 59. Undisputed.

- On October 21, 2016, A. Leftenant, N. Leftenant, and Johnson filed an application for the CAMEO trademark with the U.S. Patent and Trademark Office ("USPTO") that was rejected in May 2018 because Blackmon was granted the mark. ECF No. 284 at 17-19 ¶¶ 50, 55. Undisputed.

- N. Leftenant, A. Leftenant, Bright, and Johnson released "We In The House" in 2016 under the CAMEO mark, but did so while the application for the CAMEO trademark filed by these Plaintiffs was pending. ECF No. 284 at 17-18 ¶¶ 50-51, not disputing these facts. ECF No. 292 at 11 ¶ 36. Undisputed.

- Jenkins was not a performer on the sound recording "We In The House" released in 2016. ECF No. 292 at 11 ¶ 36. Undisputed.

- N. Leftenant first performed as the ORIGINAL CAMEO FAMILY in 2011. He created an ORIGINAL CAMEO FAMILY Facebook page sometime in 2011-2012. ECF No. 273-2 (N. Leftenant Decl.) at 4 ¶¶ 23, 25.

- N. Leftenant started the ORIGINAL CAMEO FAMILY after he ceased performing with CAMEO, but while he contends he remained a member of the Band. Johnson performed once with the ORIGINAL CAMEO FAMILY, while Bright and Jenkins never performed with this group. It is unclear whether A. Leftenant ever performed with this group. ECF Nos. 284 at 16 ¶ 62; ECF No. 273-6 at 2 ¶¶ 12; 292 at 8 ¶ 24. *See also* ECF No. 284 at 20 ¶ 62, response thereto. A. Leftenant apparently wrote the song at issue. 284-1 at 76 (A. Leftenant Deposition).[6]

---

[6]    A. Leftenant apparently testified during deposition to performing with the group. ECF No. 284 at 20 ¶ 62, response thereto. However, A. Leftenant states in his Declaration he did not do so. ECF No. 273-6 at 2 ¶ 11. Blackmon contends that Jenkins was advertised as touring with the ORIGINAL CAMEO FAMILY *citing* to ECF No. 275-5 at 42; however, this page is a posting by N. Leftenant not Jenkins.

- For purposes of the pending Motions, Blackmon does not dispute that that the ORIGINAL CAMEO FAMILY performed on six occasions with the first on October 12, 2012 and the last on September 26, 2015.  ECF No. 284 at 19 ¶ 59.  Undisputed.

- The parties entered into a CAMEO Featured Artist/Performers Agreement effective April 14, 2021 that was submitted to SoundExchange.  ECF No. 292 at 16 ¶ 69.  Undisputed.

- Blackmon performed on, produced, and composed on every CAMEO album, compilation, and single.  *Id*. at 6 ¶ 15.  Undisputed.

- Blackmon was CAMEO's producer and handled many financial matters for the Band.  ECF No. 284 at 5 ¶ 9.  Undisputed as to this fact.

- All CAMEO albums have liner notes and credits that were drafted by Blackmon.  *Id*. at 8 ¶¶ 10-11.  Undisputed as to these fact.

- Photos, names, and likenesses of all Plaintiffs "have been used consistently since 1974 to market" CAMEO, including on social media, album and single covers, in sound recordings and on the UMG website.  *Id*. at 19 ¶ 58.  Undisputed.

All other facts in this case are in dispute.  These disputes include, but are not limited to, who played leadership roles in the Band, who had final say over creative and business operations, who made personnel decision, who set the rehearsal schedules, who was responsible for wardrobe, live performances, and TV appearances, when the ORIGINAL CAMEO FAMILY Facebook page deleted reference to CAMEO, use of the CAMEO mark, and who owns the CAMEO mark for sound recordings and live performances (collectively the "marks").  The Court addresses these facts (and others) as appropriate when discussing claims on which summary judgment is sought.

## II.   The Summary Judgment Standard

Summary judgment is proper when the moving party shows "there is no genuine dispute as to any material fact" based on "materials in the record, deposition, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatories, answers, or other materials or … showing the materials cited do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  In assessing a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014).  "When the party moving for summary judgment would bear the burden of proof at trial,

it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate.  *See id.* at 250-51.  "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"  *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (*quoting First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).  If the movant has carried its burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists.  *Matsushita*, 475 U.S. at 586.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita*, 475 U.S. at 586-87).

### III.   Plaintiffs' Count I, Tortious Interference with Contractual Relations

To state a claim for tortious interference with contractual relations, the moving party must show that there was "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) international acts intended or designed to disrupt the contractual relationship; (4) disruption of the contract; and (5) resulting damage."  *J.J. Indust., LLC v. Bennett*, 71 P.3d 1264, 1276 (Nev. 2004) (internal citation omitted).  A three year statute of limitations applies to such claims in Nevada.  *Harfouche v. Wehbe*, Case No. 2:13-cv-000615-LDG-NJK, 2014 WL 12789831, at *2 (D. Nev. Mar. 18, 2014) *citing* 11.190 (3)(c), *Stalk v. Mushkin*, 199 P.3d 838, 839 (2009); *see also Bancorp Intern. Group v. Financial Industry Regulatory Agency*, Case No. 3:13-cv- 00170-RCJ-WGC, 2014 WL 134282, at *3 (D. Nev. Jan. 10, 2014) (internal citation omitted). The court in *Harfouche* explained:

the statute of limitations begins to run "when the wrong occurs and a party sustains injuries for which relief could be sought." *Petersen v. Bruen*, …, 274, 792 P.2d 18 (1990).  When a plaintiff has not discovered his injury or cause of injury at the time of its occurrence, the statute of limitations is tolled "until the injured party discovers or reasonably should have discovered facts supporting a cause of action." *Id.*  However, when "uncontroverted evidence proves that the plaintiff discovered or should have discovered the facts giving rise to the claim," such a determination can be made as a matter of law.  *Siragusa v. Brown*, … 971 P.2d 801 (1998).

*Id.*

In this case the undisputed facts show that four of the five Plaintiffs filed their Complaint on October 10, 2018.  ECF No. 1 naming A. Leftenant, N. Leftenant, Bright, and Johnson as Plaintiffs. On April 30, 2019, Plaintiffs filed a motion seeking to add Jenkins as a plaintiff and included him in the intentional interference claim against Blackmon.  ECF Nos. 22, 23.  If any one or more of the Plaintiffs knew or should have discovered facts giving rise to the intentional interference with contractual relationship claim more than three years before each filed his intentional interference claim, that Plaintiff's claim is time barred.

A.    SoundExchange Contracts.

There is no dispute that Blackmon and Fain assisted Jenkins with registering with SoundExchange to receive CAMEO royalties in May 2013 and that Jenkins recognized there was a dispute over the Band's royalties at the time he registered.  ECF No. 292 at 13 ¶¶ 49, 50.  It is also undisputed that N. Leftenant emailed SoundExchange on July 11, 2013 telling the entity that he wanted to dispute what royalties Blackmon was getting and wanted "all royalties [for CAMEO] held until we decide who gets what."  ECF No. 292 at 13 ¶ 51; ECF No. 275-6 (Samuels Decl. Ex. 17) at 32.  On July 12, 2013, Blackmon notified SoundExchange that he and Jenkins were to receive an 80/20 split of CAMEO royalties, to which Jenkins agreed.  ECF No. 292 at 14 ¶¶ 55 and 56; ECF No. 275-6 at 21.  On July 12, 2013, N. Leftenant requested 33% split of the CAMEO royalties among Blackmon, Jenkins, and himself.  ECF No. 292 at 14 ¶ 57; ECF No. 275-6 at 43.  On July 19, 2013, Blackmon (through Fain) sent an email to SoundExchange, N. Leftenant, and Jenkins rejecting a featured artist royalties split that would have given one-third to each of these three individuals.  ECF No. 275-6 at 53.  On July 19, 2013, SoundExchange notified N. Leftenant and Jenkins (along with Blackmon) that all future artist royalties for CAMEO would continue to be placed on hold until the

parties agreed on the distribution. *Id*. at 52. Thus, with respect to N. Leftenant and Jenkins, the uncontroverted evidence demonstrates they discovered or should have discovered the facts giving rise to the alleged intentional inference by Blackmon with their respective SoundExchange contracts no later than July 19, 2013. This is more than three years before N. Leftenant and Jenkins filed their intentional interference claims.

Plaintiffs also do not dispute that on October 1, 2014, Bright was placed on notices that CAMEO royalties were in dispute and on hold by SoundExchange. ECF No. 275-6 at 51-53.[7] Thus, Bright's intentional inference with contractual relations is also time barred as October 1, 2014 is more than three years before Bright initiated his claims on October 10, 2018.

On October 7, 2015, A. Leftenant exchanged emails with Blackmon's counsel in which A. Leftenant recognized there was a dispute regarding the distribution of CAMEO royalties held by SoundExchange stating a "resolution" is required. ECF No. 142-1 at 2-3; *see also* ECF No. 292 at 15 ¶¶ 62-63 (not disputing these assertions of fact by Blackmon). The email chain was forwarded to Johnson on the same date. ECF No. 142-1 at 2. It is also undisputed that A. Leftenant and Johnson registered with SoundExchange for Cameo royalties on October 7, 2015. ECF No. 292 at 15 ¶ 64. The email exchange with Blackmon's counsel, together the registration with SoundExchange all on October 7, 2015, evidences that A. Leftenant and Johnson knew of or certainly should have discovered the facts giving rise to their claim of intentional inference with contractual relations by Blackmon on October 7, 2014, more than three years before they filed their Complaint in this Court. Thus, A. Leftenant and Johnson's intentional interference with contract claims are barred by the three year statute of limitations.

Plaintiffs argue in opposition to Defendant's Motion for Summary Judgment that after October 10, 2015 Defendant "committed acts that disrupted Plaintiffs['] contracts with SoundExchange." ECF No. 292 at 36. The act to which Plaintiffs' point is Defendant's refusal to mediate the royalty claims. *Id*. at 37. But Blackmon's refusal to mediate fails to state a separate intentional interference with contract claim because Plaintiffs provide no evidence that Blackmon

---

[7]       This is an email from SoundExchange to Kat Fain on behalf of Blackmon copying N. Leftenant, Jenkins, and Bright attached to which is the July 2013 email explaining Blackmon's rejection of the one-third split of royalties and placing the CAMEO account on hold.

had a contractual obligation to do so. In fact, mediation was a voluntary service offered by SoundExchange. A basic tenet of an intentional interference tort is the existence of a contractual obligation allegedly disrupted by the defending party. *J.J. Indust., LLC*, 71 P.3d at 1267. In the absence of a contractual obligation interfered with by Blackmon, there is no violation of law.

Plaintiffs further argue a continuing violation theory by virtue of Defendant's claim to all CAMEO royalties well into the three year limitations period. Plaintiffs state that it was Defendant's "intentional resistance and refusal to communicate and resolve the overlapping claims with Plaintiffs [that] caused this lawsuit." *Id.* While Plaintiffs cite a single Ninth Circuit case and two California state law cases pertaining to the continuing violation theory they ask the Court to apply, Plaintiffs fail to recognize that Nevada rejects this theory as applicable to Nevada state torts. *Nickler v. Clark County*, Case No. 2:18-cv-01668-JCM-VCF, 2019 WL 1598749, at *4 (D. Nev. Apr. 15, 2019) ("the continuing violation doctrine" is "inapplicable to state torts" in Nevada) *affr'm in part and rev'd in part*, 802 F. App'x 262, 264 (9th Cir. 2018) (finding no cases applying the continued violation doctrine to intentional interference with prospective economic advantage "style tort[s]").

B.   AARC Contracts.

Plaintiffs raise the same intentional interference claim applicable to AARC contracts. AARC was formed in 1992 after an amendment to the Copyright Act of 1976. AARC collects so-called newly created "blank tape royalties" (a sur-tax on blank media such as tapes and CDs to compensate copyright owners and artists for unauthorized taping of their recordings or performances) and pays the same to featured artists. ECF No. 306 at 5 n.3. Unfortunately, Plaintiffs do not establish that anyone other than N. Leftenant and Bright had contractual agreements with AARC and, therefore, fail to establish that Defendant could have interfered with such contracts. ECF No. 292 at 39, n. 20 stating: "Plaintiffs N. Leftenant and Jeryl Bright have registered with AARC." ECF Nos. 306 at 12 ¶ 22; 273-2 ¶ 17; 282-1 (Rosario Decl. filed in support of Opposition to Defendant's Motion for Summary Judgment) Exs. C and H.[8]

---

[8]   Exhibit C to Rosario Declaration (ECF No. 282-1 at 110-111) contains a note identified as AARC communication with Nathan Leftenant. *Id.* at 2 ¶ 4. The Exhibit H to Rosario's Declaration (ECF No. 282-1 at 127) is Bright's July 2018 AARC registration.

The only other evidence provided by Plaintiffs is a November 2011 email from AARC to Fain on behalf of Blackmon stating that N. Leftenant and Jenkins, along with Blackmon, should each receive 33% of CAMEO royalties collected by AARC.  ECF No. 273-2 at 29.  In response to this email from AARC, Blackmon instructed Fain to contact N. Leftenant, which she did, and instruct him to stop contacting "these organizations (ie: AARC, SoundExchange, etc.) …." *Id*. at 28.  There is no evidence that this email from Blackmon was shared with Jenkins.

Plaintiffs contend this email exchange is evidence that Defendant told AARC he would pay Plaintiffs their representative share of royalties.  ECF No. 306 at 12 ¶ 26.  The Court rejects this conclusion as unsupported by the content of the email on which Plaintiffs rely.  However, Plaintiff offers a separate email from Fain to AARC, copied to Blackmon, dated November 16, 2011, instructing AARC to pay 100% of the royalties "directly to" Blackmon.  ECF No. 273-1 at 259.[9]

Moreover, while it is true that Blackmon knew that at least N. Leftenant and Jenkins were making claims to AARC collected royalties by virtue of N. Leftenant's email to AARC, there is no evidence that Blackmon knew there were actual contracts between any Plaintiff and AARC.  And, based on Plaintiffs' evidence and statements in declarations, it is clear that Jenkins, Johnson, and A. Leftenant had no such agreements.  In the absence of evidence demonstrating the existence of contracts between AARC and Jenkins, Johnson, or A. Leftenant, Blackmon could not have interfered with their contractual rights and these Plaintiffs' intentional interference with AARC contractual rights claim fail as a matter of law.

With respect to N. Leftenant, the evidence presented shows that Blackmon was made aware of N. Leftenant's claims to AARC collected royalties in November 2011; Blackmon instructed N. Leftenant at that time to work solely through him to obtain AARC collected royalties; and Blackmon told AARC to send 100% of the AARC-collected royalties to him.  This evidence demonstrates that N. Leftenant's claim of Blackmon's alleged interference with his AARC contract accrued no later than November 2011, which is substantially more than three years before N. Leftenant filed his intentional interference with contract claims in October 2018.

---

[9]     As stated above, Plaintiffs filed their Motion for Summary Judgment numerous times.  ECF No. 306 is the final filing and the one cited by the when *citing* the Motion itself.  However, to add to confusion, the Exhibits to Plaintiffs Motion for Summary Judgment are found at 273-9.

Bright had a contract with AARC (ECF No. 282-1 at 127); however, Plaintiffs offer no evidence regarding when Bright shared this information, if ever, with Blackmon.  Bright states in his Declaration that he, along with other featured artists of CAMEO, agreed they should share in royalties collected by AARC.  ECF No. 273-5 at 2 ¶ 10.  Bright does not state when this occurred, if Blackmon was part of the agreement or if the agreement was shared with Blackmon.  Bright also states that he received no payment of royalties from AARC and last performed with CAMEO in July 2015.  *Id*. at 3 ¶ 14.  Attached to Bright's Declaration is a series of email with Fain, who was communicating on behalf of Blackmon, regarding SoundExchange royalties.  *Id*. at 27.

There is no evidence offered by Bright, or any other Plaintiff, supporting the fact or inference that Blackmon knew Bright had a contract with AARC regarding CAMEO royalties.  Further, Blackmon could not have interfered with Bright's contract with AARC in 2011 because Bright did not have an AARC contract until July 2018.  ECF No. 282-1 at 127.  There is nothing offered by Bright that evidences Blackmon's intent to interfere after that date.  It is Bright's burden to offer evidence in support of each of the element of his claim.  Rule 56 requires "the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Bright's claim regarding interference with payment of AARC-collected CAMEO royalties because he fails to offer any evidence establishing Blackmon knew he had a contract with AARC or that Blackmon ever intended to interfere with that contract.

C.   Findings.

When the facts alleged to support Plaintiffs' intentional interference with contractual relations claims are viewed by the Court (whether in a light most favorable to Plaintiffs or Defendant as both move for summary judgment on this claim), the claim fails as a matter of law.  Plaintiffs' claim of intentional interference by Blackmon with their respective SoundExchange contracts are time barred.  N. Leftenant's claim of intentional interference by Blackmon with his AARC contract is also time barred.  Jenkins, Johnson, and A. Leftenant present no evidence that they had contracts with AARC and, thus, their claims of intentional interference by Blackmon with AARC contracts

1  fail as a matter of law.  Bright's clam of intentional interference by Blackmon with his AARC

2  contract fails as a matter of law because there is no evidence Blackmon knew such contract existed

3  and therefore intended to interfere with such contract.  Summary Judgment is granted in favor of

4  Blackmon and against Plaintiffs on this claim.  Because Plaintiffs' intentional interference claim

5  fails as a matter of law, Plaintiffs' request for punitive damages on this claim also fails.[10]

6  **IV.    Ownership of the Trademarks at Issue**[11]

7          Blackmon correctly contends that registration of the CAMEO mark for live recordings with

8  the USPTO, which he accomplished in March 2017, "constitutes prima facie evidence of the validity

9  of the registered mark and of [the registrant's] exclusive right to use the mark on the goods and

10  services specified in the registration." *Applied Info Sciences Corp. v. eBay, Inc.*, 511 F.3d 966, 970

11  (9th Cir. 2007) *citing Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d

12  1036, 1047 (9th Cir. 1999).  Prior to March 2017, Blackmon had a common law trademark in

13  CAMEO live performances and, at all times relevant to this dispute, has held a common law

14  trademark in CAMEO sound recordings.  While the presumption under federal law does not apply

15  to Blackmon's claims arising under common law, the District of Nevada previously determined the

16  analysis of claims arising from common law trademarks under Nevada law and USPTO registered

17  trademarks under federal law are insufficient to merit separate examination thereby allowing the

18  Court to incorporate the Court's consideration of Blackmon's federal and common law trademark

19  infringement claims into one discussion.  *Car-Freshner Corp. v. Valio, LLC*, Case No. 2:14-cv-

20

21  [10]    In addition to the above, the parties entered into a stipulation on May 6, 2021 (ECF No. 269) stating:

22       IT IS HEREBY STIPULATED AND AGREED by and between the parties and/or their respective counsel(s)
   that the claims contained in the Fourth Cause of Action of the Third Amended Complaint (Docket No. 252) are

23  voluntarily dismissed with prejudice pursuant to Fed. R. Civ. Pro. 41(a)(1)(A)(ii) solely to the extent that it
   seeks a declaration that (i) Plaintiffs are "featured CAMEO artists" for the purpose of collecting featured artist

24  royalties from SoundExchange and AARC, (ii) that Plaintiffs are entitled to *pro rata* share of the "featured
   artist royalties from SoundExchange and AARC, and (iii) that Plaintiff Jenkins is entitled to a *pro rata* share of

25  the "featured artist" royalties from SoundExchange and AARC for the *El Passo* single.

26  Defendant argues this stipulation forecloses Plaintiffs' Intentional Interference claim.  Plaintiffs contend the stipulation
   is specific and narrow and does not foreclose their claims for damages.  The Court does not reach this issue because it
   finds Plaintiffs' Intentional Interference with Contractual Relations claim fails for other reasons.

27  [11]    Defendant asserts Plaintiffs infringed on his federally registered and common law (unregistered) trademarks.
   ECF No. 212 (Blackmon's Counterclaims) Counts I through IV.  Plaintiffs do not dispute Blackmon's ownership in

28  CAMEO's marks.  Rather, each assert co-ownership of all such rights.  ECF No. 292 at 17, n.3, 18.

01471-RFB-GWF, 2016 WL 7246073, at *7 (D. Nev. Dec. 15, 2016); *see also Herb Reed Enterprises, Inc. v. Monroe Powell's Platters, LLC*, 842 F.Supp.2d 1282, 1288 (D. Nev. Feb. 1, 2012) ("To establish a likelihood of success on the merits of a trademark infringement claim, a plaintiff must establish that he is '(1) the owner of a valid, protectable mark, and (2) that the alleged infringer is using a confusingly similar mark.' *Grocery Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 951 (9th Cir. 2007)); *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 n.6 (9th Cir. 1999) (the analysis is the same for infringement claims based on registered and unregistered trademarks).  Before the Court can proceed with an infringement analysis, it must determine if any one or more of the Plaintiffs are "co-owners" of the trademarks at issue.[12]

A.   <u>Ownership Considered</u>.

To establish a protectible ownership interest in a common law trademark, the owner must "establish not only that he or she used the mark before the mark was registered, but also that such use has continued to the present." *Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt.*, 744 F.3d 595, 599 (9th Cir. 2014); *Herb Reed Enterprises*, 842 F.Supp.2d at 1288 ("To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services."); *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir.), *as modified*, 97 F.3d 1460 (9th Cir. 1996).  "It is a fundamental principle of trademark law in the United States that acquisition of rights in common law trademark is obtained by actual use." *Airs Fragrance Prods. v. Clover Gifts*, Case No. 2:05-cv-0960-RCJ-RJJ, 2008 WL 11385447, at *3 (D. Nev. Sep. 24, 2008) (citing J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition (4th ed. 2008), § 16:1)).  With respect to Blackmon's presumptive ownership of the registered trademark in live performances, as of March 28, 2017, the date of registration, Plaintiffs "must overcome this

---

[12] The Court notes it previously ruled, and now reiterates, that to the extent Blackmon brings claims under § 32 of the Lanham Act, 15 U.S.C. § 1114, for events occurring before his mark in Live Performances was registered with the USPTO on March 28, 2017, his claim is barred as a matter of law.  The Court disagrees with Blackmon's reading of *Synergy Tech & Design Inc. v. Terry*, Case No. C-06-02073-JSW, 2007 WL 1288464, at *4 (N.D. Cal. May 2, 2007). This case, and all cases citing to its holdings, make clear that "there is no potential for [a plaintiff] to recover ... for federal trademark infringement [under § 32 of the Lanham Act] for conduct that occurred prior to the registration of the subject marks." *Id.* (citation omitted).  In contrast, Blackmon does not need to demonstrate registration of a trademark to pursue claims under Sec. 43(a) of the Act (*Kendall-Jackson Winery, Ltd. v. E & J Gallo Winery*, 150 F.3d 1042, 1047 n. 7 (9th Cir. 1998)) or, obviously, common law.

presumption by a preponderance of the evidence." *Sengoku Works Ltd.*, 96 F.3d at 1219 (internal citations omitted).

"The purpose of a trademark is to allow customers to identify the manufacturer or sponsor of a good or the provider of a service." *Kassbaum v. Steppenwolf Productions, Inc.*, 236 F.3d 487, 493 (9th Cir. 2000) (internal citation omitted); *see also Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1129 (11th Cir. 2018) ("The purpose of a mark is to be identifiable as a unique entity— to be known by a name."). In the case of a musical group such as CAMEO, each Plaintiff's "rights derive from his membership in the … group." *Robi v. Reed*, 173 F.3d 736, 739 (9th Cir. 1999). However, as stated in *Commodores Ent. Corp.*, where there is no apparent dispute that valid marks in the name CAMEO did and do exist, the issue is "[w]hat happens to the ownership of a trademark in the name of a performing group when the group's membership has evolved with time? Our analysis starts with the common-law rights to the marks and the original ownership of those rights. While we have created a national system to register marks, common-law rights are not overridden by that registration system." *Commodores Ent. Corp.*, 879 F.3d at 1131 (internal citation omitted).

B.   First Use.

There appears to be no material dispute that the name CAMEO was adopted by the Band after Blackmon recorded a single in 1975 released under the group name The New York City Players. ECF No. 276-1 at 2 ¶ 5. There is also no dispute that Jenkins and Johnson were founding members of CAMEO; that N. Leftenant and A. Leftenant joined soon after or as CAMEO was adopted by the Band as its name; and Bright joined CAMEO in 1979.[13] ECF Nos. 273-2 at 1 ¶ 3; 275-1 (Blackmon Decl.) at 3 ¶ 8; 276-1 at 12 ¶ 19; 284 at 1-2; 292 at 7 ¶ 20. It appears undisputed that the six

---

[13]   "It is axiomatic in trademark law that the standard test of ownership is priority of use. To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Sengoku Works Ltd.*, 96 F.3d at 1219. To this law the Court applies facts asserted by Blackmon that A. Leftenant and N. Leftenant joined CAMEO in late 1975 or early 1976. ECF No. 276-1 at 12 ¶ 19; ECF No. 275-1 (Blackmon Decl.) at 3 ¶ 8. However, because Blackmon states Find My Way was released by The New York City Players, not CAMEO, and the group became CAMEO after this release (ECF No. 276-1 at 10 ¶¶ 3, 5), whether there was prior use of the name CAMEO before A. Leftenant and N. Leftenant became part of the Band is disputed and not a basis upon which the Court finds in favor of Blackmon. Because Bright joined years after the CAMEO was used in commerce, his rights are junior to Blackmon's.

The Court further notes that while Blackmon claims to have come up with the name CAMEO, as does Johnson, there is no evidence offered by Blackmon of use of the name CAMEO for the Band in commerce before Jenkins and Johnson were part of the Band. *See* ECF No. 275-1 (Blackmon Declaration) at 3 ¶¶ 7-9 excluding A. Leftenant, N. Leftenant, and Bright from the Band at the time the name CAMEO was adopted.

individuals who made up CAMEO performed, recorded, and released albums together until 1981 when A. Leftenant left CAMEO, followed by Johnson and Bright in 1982.  *See* discussion below. Thus, as the court found in *Commodores Entertainment Corporation*, this Court finds the common law trademarks associated with CAMEO through 1981 were owned by the Band as a whole as all five members were closely associated with CAMEO through that date.  879 F.3d at 1131-32. However, the Court must consider what happened to rights in CAMEO's marks as each Plaintiff is alleged to have ceased his continuous relationship with the Band.

C.   Johnson's Ownership of CAMEO marks.

Johnson admits he has not had a role in or recorded or performed with CAMEO since 1982. ECF Nos. 273-4 (Johnson Decl.) at 2 ¶ 10; 292 at 6 ¶ 18 (undisputed).  Johnson further admits he performed only once with the ORIGINAL CAMEO FAMILY in October 2012.  ECF No. 273-4 at 3 ¶ 15.  It is undisputed that CAMEO last released an album in the year 2000.  ECF No. 212 (Defendant's Amended Counterclaims) at 23 ¶ 28.  Johnson's last association with CAMEO's marks was his participation in and Facebook communication regarding the release of the single "We In The House" in 2016, which did not involve Blackmon or Jenkins and which Blackmon contends was a violation of law.  ECF No. 273 ¶ 23; 276-1 at 17 ¶ 38.

The facts and evidence pertaining to Johnson's involvement with and/or participation in CAMEO since his departure in 1982 fail to establish an ownership interest in the CAMEO marks after that date.  As stated, Johnson admits that he left CAMEO in 1982, 18 years before the Band released its last album in 2000.  Johnson also effectively admits there was a 30 year lapse between his last potential live performance with CAMEO, at best in 1982, and his single live performance with the ORIGINAL CAMEO FAMILY in 2012.  And, Johnson admits that, at best, he last appeared on a CAMEO recording in 1982 and next participated in a recording with the Band (albeit a contested recording) in 2016 when "We In The House" was released—a 34 year lapse in time.  As explained in *Robi*, and confirmed by other cases around the country, "there is no inalienable interest at stake that would attach to the departing member" of a group.  173 F.3d at 740 (internal citations omitted). Further "members of a group do not retain rights to use the group's name when they leave the group." *Id*. at 739.

"The use necessary to acquire protectable [trademark] rights is more than token or *de minim[i]s* use. … The use must be bona fide[,] commercial in character, and continuous, i.e., accompanied or followed by activities which would tend to indicate a continuing effort or intent to continue such use and place the product on the market on a commercial scale within a time demonstrated to be reasonable in the particular trade." *Toughlove America, LLC v. MTV Networks Company*, Case No. CV 09-01521-SJO (Ex), 2009 WL 10669245, at *6 (C.D. Cal. Apr. 21, 2009) *citing*, in part, *Dep't. of Parks and Recreation for State of California v. Bazaar Del Mundo Inc*., 448 F.3d 1118, 1126 (9th Cir. 2006) (additional cites, internal quote marks, and brackets omitted).  "To be "continuous, the use must be maintained without interruption, not sporadic, casual, and nominal." *Id*. quoting *Garden of Life, Inc. v. Letzer*, 318 F. Supp. 2d 946, 957 (C.D. Cal. May 10, 2004) (internal quote marks and citation omitted); *see also Robi*, 173 F.3d at 740 ("it has also been held that a person who remains continuously involved with the group and is in a position to control the quality of its services retains the right to use of the mark") (citation omitted).

Johnson's involvement with CAMEO since 1982 was indisputably limited and his interest in the mark, whether for sound recordings or live performances after he left the Band, even viewed in a light most favorable to him, was minimal and, at best, infrequent.  There is no evidence supporting Johnson's contention of continuous use or intent to use the CAMEO marks in commence.  What use there was by Johnson demonstrates, as a matter of law, he did not retain an ownership interest in these marks allowing his use after his departure from CAMEO in 1982.

D.    Bright's Ownership of CAMEO marks.

Bright joined CAMEO in 1979, appeared on five of the 18 albums released by the Band, and left in 1982 to pursue other opportunities.  ECF Nos. 273-5 (Bright Decl.) at 1-2 ¶¶ 3, 5; 292 at 7 ¶ 20 (undisputed).  While Bright says he has over 20 years of service with CAMEO (ECF No. 273-5 ¶ 5), Bright does not describe this service and does not dispute Blackmon's statement that after 1982 Bright appeared sporadically with CAMEO but otherwise has not recorded with or had any role in the Band's business affairs.  ECF No. 292 at 7 ¶ 20.  Bright also offers no discussion and cites to no evidence showing he managed or played a role in the management of CAMEO at any time.  *See*, generally, ECF Nos. 306 (Plaintiffs' Motion for Summary Judgment) and 292 (Plaintiffs' Opposition

to Defendant's Motion for Summary Judgment).   Bright admits he never performed with or authorized an advertisement for the ORIGINAL CAMEO FAMILY.  ECF No. 273-5 at 3 ¶ 15.  In fact, Plaintiffs state Bright had no involvement with the ORIGINAL CAMEO FAMILY at all.  ECF No. 306 at 46.  Bright was one of the Plaintiffs who released "We In The House" under the CAMEO mark in 2016.  ECF Nos. 273-5 at 3 ¶ 19; 306 at 17 ¶ 51.  Bright admits that Blackmon was CAMEO's producer and handled many of the Band's financial matters.  ECF No. 306 at 9 ¶ 9.

Between 1982 and 2016, when Bright participated in the release of "We In The House," the only evidence of involvement with CAMEO is his sporadic appearances in live performances.  There was an 18 year lapse between when Bright admittedly left CAMEO and CAMEO's last album release in 2000.  There was a 34 year lapse between Bright's last appearance on a CAMEO recording (1982 when Bright left the Band) and 2016 when "We In The House" was released.  Bright does not contend that he was continuously involved in CAMEO live performances, but only that between 1979 when he joined CAMEO and 2015 when he last performed with CAMEO (a 37 year time period) he had 20 years of service.

Here, the evidence does not demonstrate continuous use of the CAMEO mark in recordings or in live performances by Bright after his departure from the Band in 1982.  While 20 years of service over a 37 year period is not insignificant, Bright presents no evidence showing what he did that comprises these years of service.  Defendant contends that Bright's performances with CAMEO after his departure were all at Defendant's invitation.  Further, like Johnson, the only evidence offered by Bright regarding his involvement in CAMEO sound recordings demonstrates this would have ceased in 1982 and not resumed until 2016 with the release of "We In The House."

Bright's use of the CAMEO marks was not without interruption, was not continuous, and does not tend to indicate a continuing effort or intent to continue such use of the CAMEO marks on a commercial scale.  *Toughlove America*, 2009 WL 10669245, at *6.  The Court finds that the totality of the evidence demonstrates Bright did not retain an ownership interest and the right to use the CAMEO marks after he left the Band in 1982.[14]

---

[14]      In addition to these bases for finding Bright does not have an ownership interest in CAMEO's marks, the Court refers the reader back to n.13 in which the Court finds Bright's use of CAMEO was junior to that of Blackmon's.

1          E.          A. Leftenant's Ownership of CAMEO marks.

2          The parties dispute whether A. Leftenant was a founding member of CAMEO.  ECF No. 284

3    at 6.  Further, while A. Leftenant states he continuously used the CAMEO marks since 1975 (ECF

4    No. 273-6 (A. Leftenant Decl.) at 1 ¶ 3), this is a disputed fact.  ECF No. 284 at 2, 17.  However,

5    there is no dispute that A. Leftenant appeared on seven of the 18 CAMEO released albums and

6    "served with CAMEO for over six years."  ECF No. 273-6 (A. Leftenant Decl.) at 2 ¶ 7.   In his

7    Motion for Summary Judgment, Defendant states that "[a]part from a guest performance in the 2001-

8    2002-time frame, … A. Leftenant … had no role with the [B]and …."  ECF No. 276-1 at 12 ¶ 19.

9    Importantly, A. Leftenant does not dispute this fact in opposition to Defendant's Motion; rather he

10   states only that he was told he would perform in a sub-group of CAMEO.  ECF No. 292 at 7 ¶ 19.

11   A. Leftenant also does not dispute that Blackmon was CAMEO's producer and handled many

12   financial matters for the Band.  *Id*. at 2 ¶ 7.

13         In 2016, A. Leftenant, together with N. Leftenant and Johnson, released "We In The House"

14   under the CAMEO mark.  Except for recording and releasing the single "We In The House," there

15   is no evidence that A. Leftenant made any sound recordings under the CAMEO mark after he left

16   the Band in 1981.  A. Leftenant also states in his Declaration that he has never performed with or

17   authorized an advertisement for performance with the ORIGINAL CAMEO FAMILY.  ECF No.

18   306 at 19 ¶ 62.  Contrary to his Declaration, A. Leftenant states in his deposition that he did perform

19   with the ORIGINAL CAMEO FAMILY.  ECF No. 284-1 at 75.  Further, Defendant contends A.

20   Leftenant wrote the song "We In the House," which A. Leftenant does not dispute.  ECF No. 273-6

21   at 2 ¶ 12.  Even assuming A. Leftenant appeared on some occasion with the ORIGINAL CAMEO

22   FAMILY, there is no evidence offered regarding when this supposedly occurred.

23         The totality of the facts and evidence presented, even when viewed in a light most favorable

24   to A. Leftenant, shows that he did not participate in sound recordings of CAMEO between his

25   departure from the Band in 1981 and the release of "We In The House" in 2016—a 35 year gap.

26   This undisputed, substantial lapse in time defeats A. Leftenant's claim of ownership in the CAMEO

27   common law mark in sound recordings.

28

A. Leftenant also does not contend he continuously performed with CAMEO between the time of his departure in 1981 and 2005, the last year in which he states he appeared with the Band.[15] Even assuming more than occasional performances with CAMEO up until 2005, there is no evidence offered that A. Leftenant performed with CAMEO after this date.  And, and other than some debated, unknown date on which A. Leftenant may have appeared with the ORIGINAL CAMEO FAMILY, there is no evidence of an unauthorized live performance under the CAMEO mark by this Plaintiff. The lack of any evidence, even disputed evidence, demonstrates A. Leftenant was not involved with CAMEO sound recordings at all between 1981 and 2016 or the Band's live performances after 2005. This complete lack of evidence demonstrating continuous use or intended continuous use of the CAMEO marks defeats A. Leftenant's claim of an ownership interest in those marks.  As a departing member of a band, A. Leftenant simply had no ongoing legal interest that attached to CAMEO's mark after 1981.  *Robi*, 173 F.3d at 740; *Commodores*, 879 F.3d at 1132-33.  *See also Ramirez v. Sotelo*, Case No. ED CV 13-02155 SJO (MRWx), 2014 WL 12586115, at *4 (C.D. Cal. Mar. 10, 2014) (citing *Robi*, 173 F.3d at 740).

F.    Jenkins' Ownership of the CAMEO marks.

Jenkins is indisputably a founding member of CAMEO who performed live with the Band from its formation into 2018.  ECF No. 284 at 2 ¶ 2, at 11 ¶ 40.  Jenkins appears on all 18 albums released by CAMEO, as well as the only identified and authorized release by the Band since that date—the 2019 single El Passo—in which Blackmon also appears.  ECF No. 284 at 6 ¶ 2 (undisputed).  Jenkins never appeared with the ORIGINAL CAMEO FAMILY and did not participate or play a role in the 2016 release of "We In The House".[16]  Indeed, Defendant offers nothing to support the conclusion that at any point before Jenkins left CAMEO in 2018 he ceased performing with the Band or ceased recording with the Band.  *See* ECF No. 276-1 at 27.  While Blackmon may have been CAMEO's producer and handled many (if not most) financial matters for

---

[15]    *See* ECF No. 273-6 at 2 ¶ 8.
[16]    Blackmon cites ECF No. 275-5 at 42 as evidence of Jenkins' involvement with the ORIGINAL CAMEO FAMILY in 2019; however, this exhibit is a post from N. Leftenant's Facebook page and there is nothing offered by Blackmon to support the conclusion that Jenkins either knew of or approved the posting.

the Band, case law does not stand for the proposition that this precludes Jenkins from co-ownership of the marks during his continuous performance with the group. *Robi*, 173 F.3d at 740.

In 2016, Jenkins signed a Performance Agreement with 7Group. ECF No. 275-1 at 98-100. The agreement is countersigned by Blackmon. Jenkins contends this agreement was requested by Blackmon for dates in which Jenkins and Blackmon would appear in a Las Vegas "residency"—performers in residence at the Westgate Las Vegas Resort and Casino. ECF Nos. 273-3 (Jenkins' Decl.) at 4 ¶ 27; 276-1 at 10 ¶ 7. The Performance Agreement includes a provision stating Jenkins "shall have no interest in any trademark, trade name or other indicia relating to 'Productions', [sic] the band 'Cameo' and/or Larry Blackmon, including the right to utilize name 'Cameo' and shall not use such in any manner, whether during or after the term hereof." ECF No. 275-1 at 99 ¶ 5(g).

While this Performance Agreement may affect a waiver of Jenkins' trademark rights going forward, it cannot effect a retroactive waiver. As stated in *TCA Properties, LLC v. FJ Management, Inc.*, Case No. 3:14-cv-0267-LRH-WGC, 2016 WL 1169458, at *2 (D. Nev. Mar. 22, 2016):

> The starting point for the interpretation of any contract is the plain language of the contract. *McDaniel v. Sierra Health and Life Ins. Co., Inc.*, 53 P.3d 904, 906 (Nev. 2002); *see also*, *Klamatch Water Users Protective Ass'n v. Patterson*, 20 F.3d 1206, 1210 (9th Cir. 1999) ("Whenever possible, the plain language of the contract should be considered first."). When a contract contains clear and unequivocal provisions, those provisions shall be construed according to their usual and ordinary meaning. *Dickenson v. Nevada*, 877 P.2d 1059, 1061 (Nev. 1994). Further, "[c]ontract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself." *Klamatch Water Users*, 20 F.3d at 1210. In Nevada, a contract provision "is ambiguous if it is reasonably susceptible to more than one interpretation." *DeNigris v. Las Vegas Police Managers & Supervisors Ass'n*, 2013 U.S. Dist. LEXIS 104908 at *6, 2013 WL 3893160 (D. Nev. 2013).
>
> However, a contract "ambiguity does not arise simply because the parties disagree on how to interpret their contract." *Galardi v. Naples Polaris, LLC*, 301 P.3d 364, 366 (Nev. 2013).

The plain meaning of the Performance Agreement is not retroactive. That is, the plain language states the prohibition on Jenkins' use of CAMEO marks is during the residency and after the term of the contract ends.

Given the uncontroverted facts demonstrate that Jenkins' was a founding member of CAMEO and continuously participated in CAMEO's sound recordings and live performances

through the date in 2016 when Jenkins signed the Performance Agreement, Jenkins, like Blackmon, was a co-owner of the CAMEO marks through the effective date of that agreement.  Said differently, the evidence eliminates any question of fact regarding Jenkins' co-ownership of the CAMEO marks up to the date in 2016 when the Performance Agreement was signed.  *Commodores*, 879 F.3d at 1133.

As for Jenkins' co-ownership of the CAMEO marks after he signed the Performance Agreement, the parties dispute whether 7Group breached the contract and relieved Jenkins of any obligations thereunder.  ECF No. 273-3 at 29.  Until this dispute is resolved, which cannot be done on summary judgment because there is insufficient evidence to eliminate questions of fact regarding the alleged breach by Defendant, there remains a disputed issue of material fact regarding whether Jenkins had any ownership interest in the CAMEO marks after he signed the Performance Agreement.

G. <u>N. Leftenant's Ownership of the CAMEO marks</u>.

Finally, the Court considers N. Leftenant's ownership interest in the CAMEO marks.  While the parties dispute whether N. Leftenant was a founding member of CAMEO, it is clear he joined the Band either as or very soon after the CAMEO name was adopted by the Band; appeared on 16 or more of the 18 albums CAMEO released; identifies himself as the front man, trumpeter and vocalist for CAMEO in his personal Twitter home page; participated in the ORIGINAL CAMEO FAMILY beginning in 2011 through 2020; and participated in the 2016 release of "We In The House" under the CAMEO mark in 2016.  ECF Nos. 273-2 at 4 ¶¶ 23, 25; 284 at 6 ¶¶ 2-3, at 17-18 ¶ 51; 292 at 10 ¶ 31.  This release occurred while N. Leftenant's, with others, application for a CAMEO trademark with the USPTO was pending.  ECF No. 284 at 17 ¶ 50.

With respect to live performances, N. Leftenant admits that in 2005 he "stopped performing with" the Band while also contending "Blackmon did not perform at every CAMEO live performance."  ECF No. 273-2 at 3 ¶¶ 14, 46.  N. Leftenant says he called his group the ORIGINAL CAMEO FAMILY to distinguish it from the group that included Blackmon, and that the ORIGINAL CAMEO FAMILY has not performed since 2015.  ECF No. 273-2 at 4-5 ¶¶ 24, 28, 30, 31. There is

no evidence offered by any party to this litigation that N. Leftenant has performed or attempted to perform using the name CAMEO in any capacity since 2015.

Nonetheless, in Opposition to Blackmon's Motion for Summary Judgment, N. Leftenant also states he never formally left CAMEO.  ECF No. 292 at 8 ¶ 24 *citing* ECF No. 282-1 at 6-7.  N. Leftenant also states he worked just as hard as Blackmon to make CAMEO, appeared in at least one thousand television broadcasts, and appears in "a million cities selling records."  ECF No. 282-1 at 7 (N. Leftenant Deposition at 60).  N. Leftenant admits that Blackmon was CAMEO's producer and handled financial matters for the Band (ECF No. 292 at 2 ¶ 7), but states that he was involved in administrative actions relating to CAMEO, as well as the leadership and creative matters for the Band. ECF No. 292 at 5 ¶¶ 9, 11; ECF Nos. 282-1 at 8-11; 282-3 at 2 ¶ 5.[17]  N. Leftenant states he had responsibility for personnel and rehearsal matters for CAMEO.  ECF No. 292 at 6 ¶ 13 *citing* ECF No. 293-3 at 1 ¶ 4.

While there are no facts establishing what involvement in CAMEO, if any, N. Leftenant had after he stopped performing with CAMEO in 2005, N. Leftenant states that when Blackmon stopped dealing with him altogether, he started "the ORIGINAL CAMEO FAMILY" in 2011 and began promoting and performing with this group.  ECF No. 293-1 at 7 (N. Leftenant Depo. Transcript at 60).  N. Leftenant continued to promote the group into 2020.  ECF No. 292 at 8-9 ¶ 26.

The totality of the facts above, when viewed in a light most favorable to N. Leftenant, demonstrate he was continuously involved with CAMEO through 2005 when he stopped performing with Defendant.  While active with CAMEO, N. Leftenant asserts, albeit contested by Blackmon, that he played an active role in the Band's management of and creative process.  After (allegedly) unofficially departing Blackmon's group, N. Leftenant promoted the ORIGINAL CAMEO FAMILY for ten years (2011-2020) and recorded a single under the CAMEO sound recording mark in 2016.

These facts establish N. Leftenant's co-ownership of the CAMEO marks until the date of his departure in 2005.  Thereafter, the evidence is not sufficient to find either in favor of N. Leftenant's

---

[17]    Plaintiffs also cite Johnson's and Jenkins' Declarations, each of which make the statement that N. Leftenant was involved in CAMEO creative matters.  ECF Nos. 273-3 ¶ 6, 273-4 ¶ 6.

claim of ownership in the CAMEO marks or in favor of Blackmon's claims of infringement and counterfeiting of the CAMEO marks by this Plaintiff.  What happened between 2005 and 2011 is not offered by the parties and there is no evidence that eliminates a question of fact regarding this time period. This lack of evidence, together with N. Leftenant's efforts to perform under the CAMEO mark, register the mark with the USPTO, and record under the mark demonstrate a question of fact regarding his continued efforts or intent to continue to use and place himself and CAMEO in the market on a commercial scale.  *Toughlove America, LLC*, 2009 WL 10669245, at *6.

In *Robi v. Reed*, the court concluded that Reed founded The Platters in 1953 and was joined by Robi in 1954; Reed managed the group; was the only surviving member of the original group, and was the only member who continuously performed with the group; whereas, Robi left the group and never returned, ceased performing at all for a number of years, and was deceased.  173 F. 3d at 739-740. Here, neither party presents definitive evidence of what CAMEO did after its last album was released in 2000 or what live performances CAMEO gave between 2005 and 2011 when N. Leftenant commenced his attempt to perform as CAMEO (using the name ORIGINAL CAMEO FAMILY) believing he was co-owner of the CAMEO then-common law mark for live performances. It is true that Blackmon states N. Leftenant had no role in CAMEO after his 2005 departure (ECF No. 275-1 at 6 ¶ 18), but Blackmon's statement regarding what CAMEO did do is vague—that is, the Band "maintained a robust national and international touring schedule" until 2016 when CAMEO commenced its residency in Las Vegas.  *Id*. at 7 ¶ 24.  It is true that N. Leftenant was not part of the residency, but this affects a determination of ownership in live performances once that residency began.

Without clear evidence that Blackmon's use of CAMEO was prior to N. Leftenant's use of the Band name in commerce, together with disputed facts regarding whether N. Leftenant ever left the group, and the undisputed evidence that N. Leftenant appears on at least 16 of CAMEO's 18 albums, he made efforts to continue to use the CAMEO marks through performances, promotions, and when releasing "We In The House" through 2016, the Court finds a question of fact regarding whether N. Leftenant has an ownership interest in the CAMEO marks after 2005.

**V.     Defendant's Counterclaim I-V including Asserting Trademark Under Section 32 of the Lanham Act; Trademark Infringement Under Section 32 of the Lanham Act, False Descriptions and Representations under Section 43(a) of the Lanham Act, Common Law Trademark Infringement and Unfair Competition, and Deceptive Trade Practices under NRS 598.0915.**

As stated above, the Court finds A. Leftenant was not a co-owner of the CAMEO marks after 1981; Johnson and Bright were not co-owners of the CAMEO marks after 1982; Jenkins co-owned the CAMEO marks until 2016 when he signed the Performance Agreement after which there is a question of fact regarding his ownership; and N. Leftenant was a co-owner of the CAMEO marks until 2005, after which there is a question of fact regarding his co-ownership of the marks.

A.     Summary Judgment is granted in part and denied in part as to Jenkins.

Jenkins is granted summary judgment in his favor and against Defendant on all claims asserted by Defendant as well as Plaintiffs' Fifth Cause of Action for Declaratory Judgment for the time period measured from commencement of Jenkins' involvement with Defendant in CAMEO (and its immediate predecessor) through the day prior to the effective date of the 2016 Performance Agreement.  Defendant's claims fail and Jenkins is entitled to judgment as a matter of law for this period of time because Jenkins, as an owner of the trademark rights, could not infringe upon his co-owner's rights by exercising his own right of use.  *Puri v. Yogi Bhajan Administrative Trust*, Case No. CV-11-9503 FMO (SHx), 2015 WL 12684464, at *11 (C.D. Cal. Oct. 30, 2015).

Summary judgment is denied as to Plaintiff's Fifth Cause of Action and Defendant's Counterclaims I through V for the period of time commencing with the effective date of the 2016 Performance Agreement.  As of that date there is a question of material fact regarding Jenkins' co-ownership of the CAMEO marks.

B.     Summary Judgment is Granted in part and denied in part as to N. Leftenant.

Defendant's claims under Section 32 of the Lanham Act (Counts I and II) against N. Leftenant require a registered mark.  Defendant registered the mark in live performances on March 28, 2017.  It is undisputed that Defendant has no registered mark in sound recordings.  Thus, Defendant's Counts I and II, under Section 32 of the Lanham Act, do not apply to N. Leftenant's alleged misuse of CAMEO's sound recording common law mark (despite Defendant's pleading at ECF No. 212 at 32 ¶ 58, 33 at ¶ 65 to the contrary).  There is no evidence that N. Leftenant performed

under the CAMEO live performance mark (whether using CAMEO or the ORIGINAL CAMEO FAMILY) after 2015.  ECF No. 273-2 at 3 ¶ 14; ECF No. 284 at 19 ¶ 59.  Based on these undisputed facts the Court finds N. Leftenant could not, as a matter of law, have infringed, counterfeited or otherwise misappropriated the live performance mark in violation of Section 32 of the Lanham Act.  Defendant's Counterclaims Count I and II against N. Leftenant fail as a matter of law.  Summary judgment is granted in favor of N. Leftenant and against Defendant on these Counterclaims.

Defendant's Count III under Section 43(a) of the Lanham Act and Count IV under common law do not require a registered trademark.  Lanham Act Section 43(a) and common law trademark claims do not contain an explicit statute of limitations and, thus, the Court borrows the analogous state statute of limitations.  *Jarrow Formulas, Inc. v. Nutrition Now, Inc*., 304 F.3d 829, 835-37 (9th Cir. 2002).  In trademark actions, the analogous state statute of limitations is used to determine if equitable principle of laches is presumed to apply as a bar to the trademark claims.  *Id*. at 835.  *See also Au-Tomotive Gold Inc., v. Volkswagen of America, Inc.*, 603 F.3d 1133, 1139-40 (9th Cir. 2010) (discussing 43(a) and common law statute of limitations, applying the state's analogous statutes); *Conopco, Inc. v. Campbell Soup Co*., 95 F.3d 187, 191 (2d Cir. 1996) ("Although laches is an equitable defense, employed instead of a statutory time-bar, analogous statutes of limitation remain an important determinant in the application of a laches defense.").

If an action is brought within the analogous statute of limitations period, laches is presumed inapplicable.  *Jarrow Formulas*, 304 F.3d at 837.  When an action is brought outside the analogous statute of limitations period, laches is presumed to bar the trademark infringement claims.  *Id.*  Even though the alleged violations in trademark cases are often ongoing, laches is presumed to be triggered if any of the alleged violations occurred outside of the statutory period.  *Id.*; *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 953-54 (9th Cir. 2001) *citing Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 821-22 (7th Cir. 1999) ("trademark case; rejecting the argument that each new instance of infringement must start the clock anew on laches: 'Without the availability of the application of laches to a claim arising from a continuing wrong, a party could, theoretically, delay filing suit

indefinitely.'").[18]  Plaintiffs argue that Nevada's four year statute of limitations should apply to Defendant's Section 43(a) and common law trademark claims.  ECF No. 306 at 39 *citing* NRS 11.190(2)(d) referring to deceptive trade practices.  Defendant agrees.  ECF No. 284 at 42.

With respect to live performances, the parties do not dispute that N. Leftenant last performed under the ORIGINAL CAMEO FAMILY name on September 26, 2015, and Defendant filed his original Counterclaim alleging a violation of Section 43(a) of the Lanham Act on January 15, 2019. ECF Nos. 8, 284 at 19 ¶ 59.  This was less than 4 years after Plaintiffs' last live performance. However, the parties also do not dispute that N. Leftenant's ORIGINAL CAMEO FAMILY first performed on October 12, 2012.  ECF No. 284 at 19 ¶ 59 (undisputed).  And, Blackmon states he learned of the performance in 2012.  ECF No. 273-2 (September 20, 2012 letter from counsel for Blackmon to N. Leftenant regarding alleged infringement on live performance trademark).  Given these facts, the Court finds Defendant's claims against N. Leftenant for use of CAMEO's live performance mark under Counterclaim Count III, based on violation of Section 43(a) of the Lanham Act, and Counterclaim Count IV asserting trademark infringement and unfair competition under the common law, are barred by the doctrine of laches and fail as a matter of law.  Summary judgment is granted in N. Leftenant's favor and against Defendant on Defendant's Counterclaims for violation of Section 43(a) of the Lanham Act (Count III) and common law trademark violations (Count IV) arising from N. Leftenant's live performances.

With respect to the common law sound recording trademark held by Defendant and allegedly violated by N. Leftenant, whether under the Lanham Act or common law, these claims survive summary judgment as N. Leftenant is alleged to have used CAMEO's mark sound recordings in 2016, well within the four year statute of limitations the parties agree applies.  Further, the Court finds there is a question regarding whether N. Leftenant was a co-owner of the non-registered marks for sound recordings after 2005 and, thus, Defendant's Counts III and IV as applied to sound recording cannot be ruled upon through summary judgment motion practice.

---

[18]     Defendant erroneously argues that "for wrongful acts that occurred both within and without the limitations period, a Plaintiff is free to pursue monetary and equitable relief for the time within the limitations period."  ECF No. 299 at 7 (Reply in Support of Summary Judgment) *citing Jarrow Formulas*, 304 F.3d at 837.  However, *Jarrow* plainly states "[f]or purposes of laches, the limitations period may expire even though part of the defendant's conduct occurred within the limitations period."  *Id*. at 838.

Summary Judgment is denied as to N. Leftenant's Count V seeking declaratory judgment of co-ownership of the CAMEO marks as there is a question of material fact regarding N. Leftenant's continued co-ownership of the marks after 2005.

    C.    <u>Summary Judgment sought by and against Bright, Johnson, and A. Leftenant is granted in part and denied in part</u>.

As stated, the Court finds that Blackmon's Count I and II for trademark counterfeiting and trademark infringement under Section 32 of the Lanham Act exist only for alleged live performances occurring after the mark was registered. *Kendall-Jackson* Winery, 150 F.3d at 1047, n.7 (citation omitted); *see also United Tactical Systems, LLC v. Real Action Paintball, Inc.*, Case No. 14-cv-04050-MEJ, 2014 WL 6788310, at *6 (N.D. Cal. Dec. 2, 2014) (Section 32 of the Lanham Act suit to be based on "infringement and counterfeiting of a registered trademark … brought by the registrant of the … mark") (internal quote marks omitted); *Synergy Tech & Design*, 2007 WL 1288464, at *4 (no potential for suit recovery for infringement before the mark was registered). Because there is no allegation that Bright, Johnson or A. Leftenant performed live as CAMEO or as part of the ORIGINAL CAMEO FAMILY after Blackmon obtained a registered trademark for live performance on March 28, 2017, these claims fail as a matter of law and summary judgment is granted in favor of Bright, Johnson, and A. Leftenant and against Defendant on Defendant's Counts I and II.

The same result arises with respect to claims arising from live performances under Counterclaims III and IV as there is no evidence whatsoever that any of these Plaintiffs engaged in an unauthorized appearance under the CAMEO mark during the four year statute of limitations period the parties agree applies to these claims. In fact, it is undisputed that Bright had no involvement with the ORIGINAL CAMEO FAMILY after he left CAMEO in 1982, Johnson appeared once in 2012 with the ORIGINAL CAMEO FAMILY, and A. Leftenant may or may not have ever appeared with the ORIGINAL CAMEO FAMILY, but if he did so, Defendant presents no evidence of when this occurred. Summary judgment is granted in favor of Bright, Johnson, and A. Leftenant and against Defendant on Defendant's Counterclaim Counts III and IV arising from live performances.

Bright, Johnson, and A. Leftenant's Declaratory Judgment Claim (Count V in their Third Amended Complaint) fails as a matter of law and summary judgment is granted in Defendant's favor and against these Plaintiffs on this claim as Bright, Johnson, and A. Leftenant had no ownership rights in the CAMEO marks after their respective departures from the Band.

The Court further finds that the use of the CAMEO mark in sound recordings by Bright, Johnson, and A. Leftenant in 2016, when they participated in and released "We In The House," was an impermissible use of the CAMEO common law mark held by Blackmon because these three Plaintiffs had no ongoing rights to use the mark in sound recording after leaving the Band.  Further, Defendant's Counts III under Section 43(a) of the Lanham Act and Count IV under common law are not barred by the affirmative defense of laches because this release occurred well within the four year statute of limitations the parties agree applies to these claims.

However, to establish a violation of law Section 43(a) of the Lanham Act and common law trademark rights, Defendant must show more than the use of a protectable mark; that is, he must also show the "use of its trademark 'is likely to cause confusion, or to cause mistake, or to deceive.'" *Adobe Systems Inc. v. Christenson*, 809 F.3d 1071, 1081 (9th Cir. 2015) *quoting Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th Cir. 2010) (quoting 15 U.S.C. § 1125(a)(1)); *Caesars World, Inc. v. Milanian*, 247 F.Supp.2d 1171, 1193 (D. Nev. Feb. 19, 2003) (internal citations omitted) ("The elements necessary to make out a claim of Nevada common law trademark infringement are identical to the elements necessary under section 43(a) of the Lanham Act.").  "The 'core element of trademark infringement' is '[p]rotecting against a likelihood of confusion,' which helps to 'ensur[e] that owners of trademarks can benefit from the goodwill associated with their marks' and "that consumers can distinguish among competing producers." *Id.* (quoting *Brookfield Commc'ns v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1053 (9th Cir. 1999); *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002)).

To establish confusion, the Court looks to the eight factor test established in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).  These factors include (1) strength of the mark(s); (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels; (6) degree of consumer care; (7) defendant's intent; (8) likelihood of

expansion. *Id.* at 1076 (citation omitted).  The Court finds there is no dispute regarding the strength of the CAMEO marks or relatedness of the goods.  ECF No. 292 at 27-28.  Further, because Plaintiffs admit that "We In The House" was released under the CAMEO mark, there is no dispute regarding the similarity of the marks.  With respect to the remaining *Sleekcraft* factors, Plaintiffs argue that there is a material question of fact.  *Id*. at 28-30.

The evidence establishes that Plaintiffs' admit "We In The House" was released under the CAMEO mark and, therefore, "virtually no amount of consumer care … [could] prevent confusion." *Electropix Inc. v. Liberty Liverwire Corp.*, 178 F.Supp.2d 1125, 1134 (C.D. Cal. 2001).  This *Sleekcraft* factor falls in favor of Defendant.  As for marketing channels, Plaintiffs previously stated the parties use similar marketing channels (ECF No. 116 at 26) and offer no additional argument or contrary argument in their opposition to Defendant's Motion for Summary Judgment.  ECF No. 292. This factor also falls in favor of Defendant.

With respect to the element of intent, when an alleged infringer knowingly uses a mark of another, a court may presume that the defendant chose that mark for the purpose of deceiving the public.  *See R & R Partners, Inc. v. Tovar*, 447 F.Supp.2d 1141, 1156 (D. Nev. Aug. 10, 2006) *citing Sleekcraft*, 599 F.2d at 354.  Here, Defendant does not dispute that the use of the CAMEO sound recording mark for "We In The House" was done during the time when Johnson, A. Leftenant, and N. Leftenant's application for the trademark was pending with the USPTO.  ECF No. 284 at 17-18 ¶¶ 50-51.  It is further clear that each of these Plaintiffs who were involved in the release of "We In The House" believed they were co-owners of the CAMEO sound recording mark at the time of the release.  Given these facts, the Court cannot conclude, as a matter of law, that selection of the CAMEO mark was the knowing selection of the mark of another.

Finally, the Court considers likelihood of expansion.  This factor considers expanding into other markets using the same mark.  *Sleekcraft*, 599 F.2d at 348.  Here, there is no evidence of expansion of the use of CAMEO mark.  Between 1981, when A. Leftenant departed CAMEO (the first of the three Plaintiffs involved in the release of "We In The House") and the 2016 release of the single, this was the only sound recording made by the Plaintiffs that did not include Blackmon.

Moreover, after the 2016 release of "We In The House," there is no evidence of other sound recordings released by Plaintiffs or Defendant under the CAMEO mark.

While the majority of the *Sleekcraft* factors weigh in favor of Defendant on confusion as it applies to the use of the CAMEO mark in sound recordings, the Court finds the questions of fact regarding intent and expansion of critical importance in this particular case.  The Court therefore finds a question of fact regarding confusion and denies summary judgment on Counterclaim Count III and IV of Defendant's Counterclaims asserting violations of Defendant's ownership rights in the CAMEO sound recording marks as alleged against Johnson, Bright, and A. Leftenant.

**VI.    Nevada Deceptive Trade Practices Act**

Defendant's deceptive trade practice claim asserts that "Plaintiffs knowingly falsely represented themselves as being members of CAMEO."  ECF No. 276-1 at 35.  Defendant's Motion for Summary Judgment in his favor and against Jenkins and N. Leftenant fail because there are questions of material fact regarding their respective ownership interests in the CAMEO marks.

The only evidence offered by Defendant of that A. Leftenant potentially falsely represented himself as part of CAMEO after he left the Band was in 2016 when "We In The House" was released.  This was while A. Leftenant was participating in a trademark application for CAMEO.  These juxtapose assertions of material fact preclude summary judgment arising from A. Leftenant's association with the release of "We In The House."  Summary judgment is therefore denied as to this claim.

The evidence regarding whether and when A. Leftenant ever appeared in an unauthorized live performance using the CAMEO mark is minimal.  Indeed, the entirety of the evidence is one question and one answer in A. Leftenant's deposition transcript.  Defendant, who brings this claim, must demonstrate the absence of a question of material fact and an entitlement as a matter of law to prevail on summary judgment.  *Anderson*, 477 U.S. at 248-49.  While the Court finds the likelihood of Defendant prevailing on this claim against A. Leftenant extremely slim, the Court cannot rule out a question of fact.  Defendant's request for summary judgment in his favor against A. Leftenant for his alleged deceptive trade practice arising from live performances is denied.

There is no evidence that Bright made any unauthorized appearance as a member of CAMEO at any time after he left the Band.  There is also no evidence of any posting authorized by Bright on social media that allegedly falsely identifies him as a member of CAMEO in any live performance. Defendant's deceptive trade practice claim against Bright arising from a false and knowing representation of himself as a member of CAMEO based on a live performance fails as a matter of law and summary judgment is granted in Bright's favor on this portion of Defendant's deceptive practice act claim.

Bright, participated in the release of "We In The House" under the CAMEO sound recording mark.  However, Defendant fails to present evidence that eliminates questions of material fact regarding whether Bright knowingly falsely represented himself as part of CAMEO when this recording was released.  Thus, summary judgment is denied on Defendant's Count V Deceptive Trade Practice Act claim against Bright with respect to sound recordings.

Johnson made one appearance with the ORIGINAL CAMEO FAMILY in October 2012, participated in release of "We In the House" in 2016, and added a post to his Facebook page regarding the release also in 2016.  The release of "We In The House" occurred while Johnson's application (together with the Leftenants) for a trademark in CAMEO was pending.  Defendant fails to present evidence eliminating a question of material fact regarding whether Johnson knowingly falsely representing himself as a member of CAMEO given this pending application.  Summary judgment is denied on Defendant's Deceptive Trade Practice Act claims (Counterclaim V) against Johnson.

**VII.   Conclusion**

Based on the foregoing, the Court finds:

- Summary Judgment is granted in favor of Defendant Lawrence Blackmon and against Plaintiffs on Plaintiffs Count I, Intentional Interference with Contractual Relations, claim.  Plaintiffs' Count I is dismissed with prejudice.

- Summary Judgment is granted in favor of Thomas "Tomi" Jenkins and against Defendant Lawrence Blackmon on Defendant's Counterclaims I through V as well as Plaintiffs' Count V for all times measured from Jenkins' initial involvement in CAMEO (and its

immediate predecessor band) through the day prior to the effective date of the 2016 Performance Agreement.

- Summary Judgment is denied as to Defendant's Counterclaims I through V against Jenkins, as well as on Plaintiff's Count V asserted by Jenkins, commencing with the effective date of the 2016 Performance Agreement.  There are material questions of facts regarding Jenkins' co-ownership of the CAMEO marks as of that date.

- Summary Judgment is granted in favor of Bright, Johnson, A. Leftenant, and N. Leftenant on Counterclaims Count I and II arising from the misappropriation of Defendant's common law mark in sound recordings because Section 32 of the Lanham Act requires a registered mark to state a claim.

- Summary Judgment is denied as to Blackmon's claims under Section 43(a) of the Lanham Act (Counterclaims III) and common law trademark (Counterclaim IV) asserted against Bright, Johnson, A. Leftenant, and N. Leftenant arising from alleged misappropriation of Defendant Lawrences Blackmon's CAMEO marks in sound recordings.  There are questions of material fact associated with these Counterclaims against each Plaintiff based on the 2016 release of the "We In The House."

- Summary Judgment is granted in favor of Bright, Johnson, A. Leftenant, and N. Leftenant and against Defendant Lawrence Blackmon on Defendant's Counterclaims I through IV arising from Defendant's ownership of CAMEO marks in live performances. Counterclaims I and II are barred because Defendant did not have a registered trademark in CAMEO live performance before March 28, 2017 and there is no evidence of live performances by any of these Plaintiffs under the CAMEO mark after 2015. Counterclaims III and IV are barred for live performances by the doctrine of laches.

- Summary Judgment is denied on Defendant's Counterclaim V (Nevada Trade Practices Act) asserted against Jenkins and N. Leftenant because there is a question of material fact regarding their co-ownership of the CAMEO marks.

- Summary Judgment is denied on Defendant's Counterclaim V asserted against Bright, Johnson, and A. Leftenant based on their release of  "We In The House" because there

1    are questions of material fact regarding whether these Plaintiffs knowingly, falsely

2    represented themselves as members of CAMEO at the time of the release.

3    • Summary Judgment is denied on Defendant's Counterclaim V asserted against Johnson

4    and A. Leftenant based on live performances.  These are slim claims, but the Court finds

5    a question of fact that precludes disposing of this claim on summary judgment.

6    • Summary Judgment is granted in favor of Bright and against Defendant of Counterclaim

7    V based on live performances as there is no evidence Bight engaged in an unauthorized

8    live performance as part of CAMEO.

9    • Summary Judgment is granted in favor of Defendant and against Bright, Johnson, and A.

10   Leftenant on Plaintiffs' Count V (Declaratory Judgment).  These Plaintiffs did not have

11   an ownership interest allowing use of the CAMEO marks after they left CAMEO.

12   • Summary judgment is denied on Plaintiffs' Count V (Declaratory Judgment) asserted by

13   N. Leftenant as there is a question of material fact regarding N. Leftenant's co-ownership

14   of the CAMEO marks after 2005.

15   **VIII.   Order**

16        IT IS HEREBY ORDERED that summary judgment is GRANTED in part and DENIED in

17   part on Plaintiffs' Motion for Summary Judgment identified in CM/ECF three times as ECF Nos.

18   273, 274 and 306 as stated above.

19        IT IS FURTHER ORDERED that summary judgment is granted in part and DENIED in part

20   on Defendant's Motion for Summary Judgment identified in CM/ECF as ECF No. 275 as stated

21   above.

22        IT IS FURTHER ORDERED that Defendant's Motion to Strike Plaintiffs' Newly Raised

23   Arguments and Information ECF No. 301 is DENIED as moot.

24

25        Dated this 4th day of March, 2022.

26

27        ELAYNA J. YOUCHAH

28        U.S. MAGISTRATE JUDGE